Opinion for the court filed by Circuit Judge DYK.
Dissenting opinion filed by Circuit Judge LOURIE.
DYK, Circuit Judge.
Hugh Edward Montgomery, John Francis Martin, and Jorge Daniel Erusalimsky (collectively, “Montgomery”) appeal from a decision of the Board of Patent Appeals and Interferences (“Board”) affirming the examiner’s rejection of claims 42, 43, and 45 of U.S. Patent Application Serial No. 11/118,824 (the “'824 application”) as anticipated. See Ex parte Montgomery (“Rehearing Decision ”), No. 2011-000170, 2011 WL 514316 (B.P.A.I. Feb. 10, 2011); Ex parte Montgomery (“Board Decision”), No. 2011-000170, 2010 WL 4719114 (B.P.A.I. Nov. 18, 2010). We affirm.
Background
Montgomery filed the '824 application on April 29, 2005, claiming priority to United Kingdom applications No. 9722026.3, filed October 17, 1997, and No. 9810855.8, filed May 20, 1998. The application is directed to inhibitors of the reninangiotensin system (“RAS”), which is “important in the maintenance and control of blood pressure as well as the regulation of salt and water metabolism.” J.A. 225. As the '824 application’s specification notes, RAS inhibitors have been administered to treat high blood pressure, known as hyper *1377 tension, and “it is preferred ... to use in the practice of the invention any of the known RAS inhibitors which are either on the market or under investigation for their antihypertensive effects.” J.A. 231-32. These “known RAS inhibitors” include angiotensin-converting enzyme inhibitors (“ACE inhibitors”) such as ramipril. J.A. 232. The specification is largely directed to treating wasting diseases such as cachexia, and to improving cardiovascular fitness and physical endurance. Stroke treatment and prevention is only mentioned in passing as a potential object of this invention. See J.A. 230-31.
The claims at issue recite administering RAS inhibitors to patients diagnosed as in need of stroke treatment or prevention:
42. A method for the treatment or prevention of stroke or its recurrence, wherein said method comprises administering, to a patient diagnosed as in need of such treatment or prevention, an inhibitor of the rennin-angiotensin system, said inhibitor having a Clog P of greater than about 1.
43. The method as claimed in claim 42, wherein the inhibitor of the rennin-angiotensin system comprises at least one inhibitor of angiotensin-converting enzyme.
45. The method as claimed in claim 43, wherein the inhibitor of angiotensin-converting enzyme comprises ramipril.
J.A. 1 (emphases added). The examiner rejected these claims as anticipated by each of four prior art references: AIRE,[1] Frampton,[2] HOPE,[3] and Gohlke[4] (as evidenced by Richer[5]), all of which describe the administration of ramipril to subjects at risk of stroke.[6]
Hypertension is a known risk factor for stroke. Board Decision, 2010 WL 4719114, at *4. AIRE describes a study in which about 2000 “patients who had shown clinical evidence of heart failure,” many of whom suffered from hypertension, were treated with ramipril or a placebo. AIRE at 821-22. In particular, 289 (29%) of the patients receiving ramipril had hypertension. Id. at 822. The study found “overall a 27% reduction in the risk of death” and a 19% reduction in the risk of “the first validated event in any individual patient— namely, death, reinfarction, stroke, or development of severe/resistant heart fail *1378 ure,” and both results were “highly significant statistically.” Id. at 824. The data on stroke were not statistically significant: “The incidence of stroke was higher in the active drug group but the numbers were small and an adverse effect of the drug can be neither supported nor refuted.” Id. at 826. Frampton summarizes AIRE and other “large-scale noncomparative studies” and explains that “[t]he antihypertensive efficacy of ramipril has been confirmed” by these studies. J.A. 45.
HOPE describes the design of “a large, simple randomized trial of ... ramipril ... and vitamin E ... in the prevention of myocardial infarction, stroke, or cardiovascular death,” which recruited “[o]ver 9000 [patients] at high risk for cardiovascular events such as myocardial infarction and stroke.” HOPE at 127. HOPE discloses that at the time of its publication, all 9541 patients had been randomized and had been receiving ramipril or a placebo for at least one month.[7] (The HOPE study ultimately found that patients receiving ramipril had a statistically significant reduction in the risk of stroke,[8] but these results were not published until after Montgomery’s priority date and thus are irrelevant to an anticipation analysis.)
Finally, Gohlke describes a study of “the effects of ... ramipril on functional and biochemical cardiac parameters in stroke-prone spontaneously hypertensive rats,” which found that the treatment “improves cardiac function even at low doses.” Gohlke at 411. Richer further explains that “[t]he stroke-prone spontaneously hypertensive rat ... is an experimental model that has been widely used to investigate the potential preventive effects vs stroke and mortality of numerous antihypertensive agents. Among the latter, angiotensin I-converting enzyme inhibitors, angiotensin II ATI-receptor blockers and calcium antagonists have proven to be very effective.” J.A. 85.
The Board affirmed the examiner’s rejection of all three claims as anticipated by each of these prior art references. Board Decision, 2010 WL 4719114, at *12. The Board found that claim 42 has two elements: (1) “to administer an inhibitor of the rennin-angiotensin system,” and (2) “the patient population receiving the inhibitor ... encompasses patients diagnosed as required stroke treatment or prevention.” Id. at *4. The Board explained that each reference teaches administration of ramipril to stroke-prone patients: “AIRE identified patients with hypertension who are known to be at risk of stroke, and treated this patient population with ramipril,” “Frampton teaches treatment of hypertensive patients with ramipril” (where “hypertension is a known ‘risk factor for stroke’ ”), “the HOPE study was clearly enabled to treat patients, including patients with previous stroke, with ramipril,” *1379 and Gohlke “identifies] the rats, here reasonably interpreted as the patients, as ‘stroke-prone’ and then teaches administering ramipril to the rats.” Id. at *4, 7, 9, 10-11.
While the Board did not rule directly on whether Montgomery’s claims required that the administration be effective at treating or preventing stroke, it appeared to assume that they did include such a requirement. The Board rejected Montgomery’s argument that none of the references demonstrated that ramipril actually treats or prevents stroke, noting that ramipril inherently treats or prevents stroke, and “[i]t matters not that those of ordinary skill heretofore may not have recognized these inherent characteristics.” Id. at *4 (quoting In re Cruciferous Sprout Litig., 301 F.3d 1343, 1350 (Fed.Cir.2002)) (internal quotation marks omitted).
Montgomery filed a request for rehearing, arguing that AIRE and Frampton did not teach administration to patients diagnosed as at risk of stroke because stroke is only one of the afflictions caused by hypertension; that HOPE was merely a proposal for future research that was not enabled; and that Gohlke could not anticipate because the claim term “patient” should be limited to human beings. See Request for Rehearing, In re Montgomery, No. 2011-000170 (B.P.A.I. Jan. 24, 2011). The Board declined to modify its original decision. Rehearing Decision, 2011 WL 514316, at *4. The Board noted that “[i]t does not matter whether [AIRE] appreciated that ... treatment [with ramipril], which was undisputedly actually performed on 289 patients with hypertension and 230 patients with previous myocardial infarct, would treat or prevent stroke,” and that HOPE “was clearly enabled to treat patients, including patients with previous stroke, with ramipril.” Id. at *2.
Montgomery timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).
Discussion
Under the Administrative Procedure Act, we review the Board’s legal conclusions without deference and set aside conclusions that are “not in accordance with law,” and we review its findings of fact to determine if they are “unsupported by substantial evidence.” 5 U.S.C. § 706(2); see Dickinson v. Zurko, 527 U.S. 150, 162-65, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999).
“Determining whether claims are anticipated involves a two-step analysis. The first step involves construction of the claims of the patent at issue. Claim construction is a question of law reviewed de novo. ” In re Aoyama, 656 F.3d 1293, 1296 (Fed.Cir.2011). “During examination, ‘claims ... are to be given their broadest reasonable interpretation consistent with the specification, and ... claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art.’ ” In re Am. Acad, of Sci. Tech Ctr., 367 F.3d 1359, 1364 (Fed.Cir.2004) (alteration in original) (quoting In re Bond, 910 F.2d 831, 833 (Fed.Cir.1990)). The broadest reasonable interpretation, like claim construction in the infringement context, is a question of law that we review de novo. In re NTP, Inc., 654 F.3d 1268, 1274 (Fed.Cir.2011). “The second step [of an anticipation analysis] involves comparing the claims to the prior art. Anticipation is a question of fact reviewed for substantial evidence.” In re Aoyama, 656 F.3d at 1296. A prior art reference anticipates a patent claim under 35 U.S.C. § 102(b) if it discloses every claim limitation. Verizon Servs. Corp. v. Cox Fibemet Va., Inc., 602 F.3d 1325, 1336-37 (Fed.Cir.2010). A reference may anticipate inherently if a claim limitation *1380 that is not expressly disclosed “is necessarily present, or inherent, in the single anticipating reference.” Id. at 1337 (quoting Sobering Corp. v. Geneva Pharm., Inc., 339 F.3d 1373, 1377 (Fed.Cir.2003)) (internal quotation mark omitted). The inherent result must inevitably result from the disclosed steps; “[ijnherency ... may not be established by probabilities or possibilities.” Bettcher Indus., Inc. v. Bunzl USA Inc., 661 F.3d 629, 639 (Fed.Cir.2011) (quoting In re Oelrich, 666 F.2d 578, 581 (CCPA 1981)).
The contested elements of claim 45 are the administration of ramipril (1) “to a patient diagnosed as in need of [stroke] treatment or prevention,” (2) where such administration is “for the treatment or prevention of stroke or its recurrence.”[9] We thus determine de novo the broadest reasonable interpretation of each of these requirements. Because we conclude that HOPE discloses both requirements, we need not address Montgomery’s arguments concerning AIRE, Frampton, and Gohlke.
We first examine the requirement that the administration be “to a patient diagnosed as in need of [stroke] treatment or prevention.” Montgomery does not contest that the patients in HOPE satisfy this claim requirement. HOPE explicitly disclosed the administration of ramipril to patients “at high risk for cardiovascular events such as myocardial infarction and stroke,” and the eligibility criteria included patients with previous stroke. HOPE at 127-28. We see no error in the Board’s uncontested conclusion that HOPE discloses the administration of ramipril to patients diagnosed as in need of stroke treatment or prevention.
We next turn to the preamble requirement that the method be “for the treatment or prevention of stroke or its recurrence.” The Board did not rule directly on whether the broadest reasonable interpretation of the claims required that the treatment or prevention be effective or whether it was sufficient that the administration be designed to treat or prevent stroke.[10] But in resting the decision on inherency, the Board appeared to assume that the patent included an efficacy requirement.
We are skeptical that a proper interpretation of the claims would include an efficacy requirement. In Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc., we construed a similar method-of-treatment claim — involving “[a] method for reducing hematologic toxicity” by administering taxol to a cancer patient — and held that it “merely expressed] a purpose of reducing hematologic toxicity” rather than requiring a particular result. 246 F.3d 1368, 1371, 1375 (Fed.Cir.2001). Such a construction is even more appropriate here in the examination context, where we apply the “broadest reasonable interpreta *1381 tion consistent with the specification.” In re Am. Acad, of Sci. Tech Ctr., 367 F.3d at 1364. Nothing in the '824 specification suggests that a narrower construction is appropriate: the specification does not describe any studies that show .that RAS inhibitors are effective for stroke treatment or prevention, see J.A. 224-52, thus also suggesting that the claims do not incorporate such a requirement, see Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed.Cir.2005) (en banc) (“[CJlaims must be read in view of the specification, of which they are a part.” (internal quotation marks omitted)).
We need not resolve this question, however, for we agree with the Board that even if the claim includes an efficacy requirement, efficacy is inherent in carrying out the claim steps. See Rehearing Decision, 2011 WL 514316, at *2. We agree with the dissent that a result is only inherent if it inevitably flows from the prior art disclosure, but there is no question here that treating stroke-prone patients with ramipril does in fact inevitably treat or prevent stroke. And Montgomery does not dispute that ramipril is in fact effective at preventing or treating stroke, which is the entire premise of his patent.[11]
We have repeatedly held that “[n]ewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent.” Bristol-Myers Squibb, 246 F.3d at 1376. As we stated in Cruciferous Sprout, 301 F.3d at 1350, “[i]t matters not that those of ordinary skill heretofore may not have reeognized the[] inherent characteristics of the [prior art].”
In King Pharmaceuticals, Inc. v. Eon Labs, Inc., 616 F.3d 1267, 1270 (Fed.Cir.2010), one of the claims covered “a method of increasing the oral bioavailability of metaxalone” by “administering to the patient a therapeutically effective amount of metaxalone in a pharmaceutical composition with food.” We noted that according to the patent itself, “the natural result of taking metaxalone with food is an increase in the bioavailability of the drug,” and that “[t]he prior art discloses taking metaxalone. with food,” so the preamble was “inherently anticipated.” Id. at 1275-76. Similarly, in Cruciferous Sprout, the claims at issue included “[a] method of preparing a food product rich in glucosinolates, comprising germinated cruciferous seeds ... and harvesting sprouts prior to the 2-leaf stage, to form a food product comprising a plurality of sprouts.” 301 F.3d at 1345. We agreed that “rich in glucosinolates” is a claim limitation, but found the claims inherently anticipated because the patentee merely recognized properties that “necessarily have existed as long as sprouts themselves.” Id. at 1347, 1350.
HOPE discloses a protocol for the administration of ramipril to stroke-prone patients, and administering ramipril to-stroke-prone patients inevitably treats or prevents stroke. See HOPE at 127. Thus, HOPE inherently anticipates the claims at issue.
*1382 However, Montgomery urges that inherent anticipation requires that the claimed method have been actually performed, and that HOPE does not disclose actual performance of the method. This is not correct; HOPE reveals the actual administration of ramipril for treatment or prevention of stroke.[12] In any event, even if HOPE merely proposed the administration of ramipril for treatment or prevention of stroke (without actually doing so), it would still anticipate. Our eases have expressly rejected Montgomery’s argument. For example, in Schering, 339 F.3d at 1381, we held that a prior art patent that disclosed administering loratadine to a patient inherently anticipated a patent for a metabolite of loratadine because the inherent result of administering loratadine to a patient is the formation of the metabolite. We stated that anticipation “requires only an enabling disclosure,” not “actual creation or reduction to practice,” so that “actual administration of loratadine to patients [in the prior art] is irrelevant” — the prior art patent inherently anticipated as long as it “disclosefd] in an enabling manner the administration of loratadine to patients.” Id. at 1380; see also SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1343-44 (Fed.Cir.2005) (holding a chemical patent inherently anticipated and stating that it was irrelevant whether the inherently disclosed chemical was ever actually produced).
To be sure, as the dissent points out, “[a]n invitation to investigate is not an inherent disclosure.” Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1367 (Fed.Cir.2004).[13] But HOPE’S protocol for the administration of ramipril is far from an abstract theory — it is an advanced stage of testing designed to secure regulatory approval. HOPE was designed to obtain data for submission to regulatory agencies on the effect of ramipril on cardiovascular diseases including stroke based on substantial evidence that ramipril improved cardiovascular health, including by treating stroke risk factors such as hypertension. See HOPE at 128. It is well established that a patent may be secured, and typieally is secured, before the conclusion of clinical trials. See Eli Lilly & Co. v. Teva Pharm. USA, Inc., 619 F.3d 1329, 1335, 1343 (Fed.Cir.2010) (rejecting an enablement challenge to patents that were filed while clinical trial results were pending); Manual of Patent Examining Procedure § 2107.03 (8th ed., rev.6, Sept. 2007) (“[I]f an applicant has initiated human clinical trials for a therapeutic product or process, [Patent & Trademark] Office personnel should presume that the *1383 applicant has established that the subject matter of that trial is reasonably predictive of having the asserted therapeutic utility.”). In all relevant respects, HOPE is identical to the patent itself, which does not disclose actual results from the administration of ramipril for these purposes.[14] Montgomery conceded at oral argument that HOPE’S authors could have obtained the patent claims at issue based the HOPE reference, so it cannot be that this reference fails to anticipate.[15]
We thus affirm the rejection of claims 42, 43, and 45 of the '824 application as anticipated by HOPE. Because we affirm the Board’s decision on this ground, we need not reach the issue of whether the claims are anticipated by the other prior art considered by the Board.
AFFIRMED
Costs
No costs.

. The Acute Infarction Ramipril Efficacy (AIRE) Study Investigators, Effect of Ramipril on Mortality and Morbidity of Survivors of Acute Myocardial Infarction with Clinical Evidence of Heart Failure, 342 Lancet 821 (1993) ("AIRE”); J.A. 7-14.

. James E. Frampton & David H. Peters, Ramipril: An Updated Review of Its Therapeutic Use in Essential Hypertension and Heart Failure, 49 Drugs 440 (1995) (abstract) ("Frampton”); J.A. 45-48.

. The HOPE Study Investigators, The HOPE (Heart Outcomes Prevention Evaluation) Study: The Design of a Large, Simple Randomized Trial of an Angiotensin-Converting Enzyme Inhibitor (Ramipril) and Vitamin E in Patients at High Risk of Cardiovascular Events, 12 Can. J. Cardiology 127 (1996) ("HOPE”); J.A. 58-68.

. Peter Gohlke et al., Angiotensin-Converting Enzyme Inhibition Improves Cardiac Function, 23 Hypertension 411 (1994) ("Gohlke”); J.A. 49-56.

. C. Richer et ah, Antihypertensive Drugs in the Stroke-Prone Spontaneously Hypertensive Rat, 19 Clinical & Experimental Hypertension 925 (1997) (abstract), available at http://www. ncbi.nlm.nih.gov/pubmed/9247765 ("Richer”); J.A. 85.

. As the claims themselves state, ramipril is "an inhibitor of the rennin-angiotensin system” and an "inhibitor of angiotensin-converting enzyme.” J.A. 1. And the Board found, and Montgomery does not contest, that "[t]he ClogP properties recited in the claim[s] [are] inherently present in ramipril.” Board Decision, 2010 WL 4719114, at *2.

. HOPE was published in February 1996, and "[a]s of January 1, 1996 the study [had] completed randomizing 9541 patients." Id. at 134. Patients were "given seven to 10 days of 2.5 mg active ramipril” prior to randomization. Id. at 132. Each patient was then randomized individually "by a telephone call to a central office,” after which "the patient [was] randomized to ramipril (2.5 mg for one week, then 5 mg every day for three weeks) or matching placebo,” and was "given a date for a first follow-up visit (one month plus or minus one week) after which the dose of ramipril [was] increased to 10 mg daily.” Id. This protocol demonstrates that prior to HOPE’S publication, every patient randomized to ramipril received at least 2.5 mg ramipril daily for one week and 5 mg daily for three weeks.

. See The Heart Outcomes Prevention Evaluation Study Investigators, Effects of an Angiotensin-Converting-Enzyme Inhibitor, Ramipril, on Cardiovascular Events in High-Risk Patients, 342 New Eng. J. Med. 145, 148 tbl. 3 (2000).

. Montgomery does not dispute that a prior art reference that anticipates claim 45 (describing the administration of ramipril) necessarily anticipates claims 43 (describing the administration of "at least one inhibitor of angiotensin-converting enzyme”) and claim 42 (describing the administration of "an inhibitor of the rennin-angiotensin system, said inhibitor having a Clog P of greater than about 1”).

. The Board at first seemed to assume that efficacy was not a requirement by not including efficacy in its description of the "two elements” of the claims and by stating that “[a]ll that is required by claims 42, 43 and 45 is identifying a patient in need of the treatment, and administering ramipril to that patient,” with no mention of efficacy. Board Decision, 2010 WL 4719114, at *4, *9. But the Board then referred to the "preamble requirement of the claim to treat or prevent stroke,” id. at *9, suggesting that efficacy is a requirement.

. Montgomery contends that AIRE teaches that ramipril increases the risk of stroke because 2.5% of patients receiving ramipril suffered a stroke compared with 1.7% of patients receiving the placebo. As discussed previously, however, these results were not statistically significant, so AIRE does not teach anything about the correlation between ramipril and stroke risk; indeed, AIRE explicitly states that “an adverse effect of the drug can be neither supported nor refuted." AIRE at 826. In any case, "the question whether a reference 'teaches away’ from the invention is inapplicable to an anticipation analysis.” Bristol-Myers Squibb, 246 F.3d at 1378 (quoting Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed.Cir.1998)) (internal quotation mark omitted).

. Montgomery argues that HOPE only involved actual administration of low dosages of ramipril, and that HOPE fails to disclose actual administration in an amount sufficient for treatment or prevention. We disagree. Before HOPE’s publication date, all the patients in the HOPE study were given “seven to 10 days of 2.5 mg active ramipril,” and the patients randomized to ramipril received "2.5 mg [ramipril] for one week, then 5 mg every day for three weeks.” HOPE at 132. Moreover, Frampton discloses that "large-scale noncomparative studies” showed that "85% of patients with mild to moderate essential hypertension have responded successfully to treatment with ramipril 2.5 or 5 mg/day.” J.A. 45. Thus, even if the HOPE authors did not appreciate it, their actual administration of ramipril treated or ameliorated hypertension, which as Montgomery acknowledges, is a risk factor for stroke. In effect, therefore, HOPE inherently discloses reducing the risk of stroke (i.e., teaches "stroke prevention”) and thus inherently anticipates the claims at issue.

. For example, a document that recited administration of all known compounds for treatment of all known diseases, with no evidence that any of these treatments would be effective, would not inherently anticipate all method-of-treatment claims involving those compounds and diseases.

. Montgomery’s specification disclosed small randomized trials of the effect of losartan on muscle fatigue in militaiy recruits and the effect of enalapril on cachexia (wasting disease) in patients with heart failure. See J.A. 247-52. The specification does not disclose any clinical studies showing the effect of ACE inhibitors on stroke, nor does it disclose any plans for such studies. In this respect, Montgomery’s specification teaches even less than HOPE does about the administration of ramipril for stroke treatment or prevention.

. Oral Argument at 10:24, available at http:// www.cafc.uscourts.gov/oral-argumentrecordings/2011-1376/all (Court: "Couldn’t the HOPE people have gotten a patent based on the prior art reference that’s here? Couldn’t they have applied and gotten a patent just as you could have?" Counsel for Montgomery: "Yes, they could have.”). We do not have before us the question whether HOPE or Montgomery sufficiently demonstrated utility to secure a patent. See generally In re '318 Patent Infringement Litig., 583 F.3d 1317, 1327 (Fed.Cir.2009) (holding that the method of treatment claims at issue were not enabled "because the ... patent’s application did not establish utility”).